RECEIVED

2019 MAY 24  A 10: 05

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

* **UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

AARON KEITH REYNOLDS                                    DEFENDANT/PETITIONER

V.                    Civil No. 2:17-651 AKK/WC
                      Criminal No. 2:14-cr-432 AKK/WC (without prejudice to the fact that Sharon Lovelace Blackburn
                      was trial judge)

UNITED STATES                                          PLAINTIFF/RESPONDENT

### PETITIONER'S REPLY TO RESPONSE OF THE UNITED STATES

Comes now Petitioner and for his reply states:

The government spends approximately 5 pages on what it claims to be "Relevant Facts and Procedural History," then devotes a page to arguing that this petition is procedurally barred, then devotes a page to the legal test for "Ineffective Assistance of Counsel" and then devotes approximately one page to Petitioner's claims. The final page (page 10) is primarily used to argue that no evidentiary hearing is necessary.

Petitioner is most grateful to the Court for clearing up confusion injected by SOMEONE, into the procedural history of the case. Petitioner was puzzled, frankly, by the case numbers involved. Petitioner filed a 2255, which was assigned case number 2:17-651 AKK-WC. This suggests that the SENTENCING judge, not the TRIAL judge, was assigned to Petitioner's petition under 28 USC 2255. Petitioner's sole point raised in the appeal brief was the assignment of a judge other than the trial judge, for the sentencing of Petitioner.

That being said, Petitioner holds this Honorable District Court in the highest regard and utmost respect. Nothing herein or otherwise should be construed as a PER SE preference for the equally Honorable Judge Blackburn. Indeed, Judge Blackburn had to ask how to pronounce "Duraski," a fair indication that Petitioner's counsel had no prior experience with the Court. Trial Transcript I, (TR I) pg. 3.

Judge Kallon made it clear that an arguable claim or contention would not draw the Court's ire, regardless of the outcome. Sentencing Transcript (Sent. TR) pg. 9. For this the Petitioner is most grateful. This case is not about personality or favor. Petitioner will set forth facts and circumstances, from the record, to show specifically the foundation of the Petitioner's claims, and why the Petitioner takes exception to certain acts.

Petitioner was knew nothing of the case number 2:18-cv-999, until he received the government's response. This was document #6, in case number 2:18-cv-999. Petitioner CLEARLY denominated his petition as an "amended" petition under 2255, and furthermore stated that he was incorporating all arguments into a single document, so that the Court could see the Petitioner's arguments without resort to a separate pleading.

This is shocking. If someone IN THE CLERK'S OFFICE decided to override Petitioner's decision, shouldn't they at least send a copy with the file mark headers at the top? This is a civil action. Ancient legal tradition holds that "the plaintiff is master of his own complaint." US V. JONES, 125 F.3d 1418, 1428 (11th Cir. 1997) Why then did Petitioner find himself with DOCUMENT 6 of a case to which he didn't even know he was a party?

These events will provide some insight, later in the brief, about why Petitioner raises claims of prosecutorial misconduct. Petitioner notes the government's claim that Petitioner is time barred, and will develop that issue herein. For the moment, please take note that the original response to 2255 was signed by AUSA Susan Redmond, whereas the current one was signed by AUSA Brandon W. Bates.

I. NELSON V. COLORADO CLAIMS WERE POTENTIALLY MERITORIOUS AND SHOULD HAVE BEEN
   PRESERVED BY APPELLATE COUNSEL                    1

, ı↑

----------------------------------------------------------------------------------------------------

The government has a "one liner" in response to Petitioner's claims under NELSON V. COLORADO, 137 S.Ct. 1249 (2018). The government at page 8 claims that "[T]hat case had no imaginable application to Renyolds' (sic) case, therefore, his counsel's failure to raise this issue on appeal is hardly ineffective assistance."

Consider first the undisputed facts of the case. Petitioner was found NOT GUILTY of all the drug charges BY A JURY OF HIS PEERS. The common law PRESUMPTION OF INNOCENCE therefore comes into play. That's the fundamental essence of NELSON.

NELSON laid out a rule to the effect that the government's "heads I win tails you lose" attitude toward jury verdicts in criminal cases, could not stand. To be sure, NELSON dealt with monetary penalties. The Supreme Court opined that the State of Colorado could not, by clever artifice, keep the economic penalties levied upon a criminal defendant, after the charges were dismissed, or after a "not guilty" verdict.

The foundation of NELSON is the presumption of innocence. Every court in the land declares the defendant "presumed innocent" - when seeking a plea from the defendant. In nearly every case, courts inform the defendant that he is "presumed innocent" and entitled to a jury trial, proof of every element of the offense beyond reasonable doubt, etc.

The question in this case, and many cases, is as follows. What happens to this "presumption of innocence" after a Judgment as a Matter of Law (JAML) is entered by a court, or a jury verdict of "guilty" is returned, or the government DISMISSES part of an indictment, often as part of a plea deal? In every such case, the OFFICIAL accusation is no longer outstanding.

The government takes the position that NOTHING bolsters its case like ANY OF THE ABOVE - so long as conviction is procured on so much as a single count. Prior to any of those events, generally perceived by the American public to be a cause for rejoicing on the part of the defendant and his defense team, and lamentations by the prosecution, everyone chants the mantra of "presumed innocence." But after the verdict, the opposite result obtains. Whereas the government had no legal right to punish for a count of a complaint NOT YET DISMISSED, the government now has EVERY RIGHT to punish, at least as effectively as if the defendant had been found guilty after trial. The government can hammer the defendant with any sentence up to and including LIFE, not on the basis of the convicted charge(s), but on the basis of the ACQUITTED conduct. In other words, the game is "heads I win, tails you lose."

Petitioner concedes that NELSON involved MONEY. Colorado lawmakers thought it great fun and games to get the money up front, then place a ridiculous burden on the defendant to get that money back, if the defendant won. Often the only desired punishment was economic. Therefore the defendant often had no real and logical incentive to fight the case in the first place. Colorado typically got its money regardless of guilt or innocence. Furthermore, by imposing legal and logistical burdens generally well in excess of the amount in controversy, Colorado lawmakers ensured that only the most bullheaded and determined defendants would EVEN TRY to get the money back. Most defendants would plead guilty to crimes of which they weren't guilty, strictly on the basis of Colorado's "trick bag" for crimes carrying only economic punishment. Who can afford to spend $5,000 to secure the POSSIBLE return of $1,000?

The US Supreme Court nixed the scam. If the defendant wins on the CRIMINAL CHARGES, the only thing incumbent upon the defendant is to ASK FOR THE MONEY BACK. There can be no "hill to climb" to get the money. The presumption of innocence springs back after an acquittal or dismissal, with all the force this maxim possessed before the judicial decision was rendered. Acquittal means acquittal - period.

That leaves us with another argument. That was money, this was liberty.

But this is perverse reasoning. The government gets extremely lenient analysis of economic regulation, generally couched under the term "rational basis." Liberty occupies an altogether different realm, in the constitutional framework. There is a reason the founders put money as #3 in the phrase "life, liberty, or property." Life comes first because without it, nothing else matters. Liberty comes second because there is no "adequate remedy at law" for the loss of liberty. Nobody can give back lost days of liberty, just as no one can raise the dead. Liberty is secondary only to life itself. For the loss of money, generally speaking, the return of the money, perhaps with interest or a penalty of some sort, is sufficient to make up for taking the money, in most contexts.

2

-------------------------------------------------------------------------------------------------------------

Petitioner's NELSON claims were arguably meritorious, well preserved by trial counsel Russell Duraski, and should have been preserved by appellate counsel.

## II.  PROSECUTORIAL MISCONDUCT - PRESENTATION OF PERJURED TESTIMONY TO THE GRAND JURY

With respect to the government's claims that Petitioner is untimely, please note that the government in its response to amended petition at page 9 says "These claims are in essence the same as those in "Ground Two" of his previous 2255 motion." The government incorporated its prior response by reference, and claimed that Petitioner's claims were "bare allegations wholly unsupported by facts."

If this is so then the government's claim of untimeliness has no merit whatsoever.  A 2255 relates back if it involves the same nucleus of operative facts.  MAYLE V. FELIX, 545 US 644, 664 (2005);  US V. GUTIERREZ, 548 Fed. Appx. 181 (5th Cir. 2013)(per curiam).  The government says the claims under the original and amended petition have such identity together that it doesn't even need to write further in response.  Gov. Response, pg. 9.  What could be stronger evidence that Petitioner's claim falls under the rule of the foregoing legal precedent?

A.  An outline of the case.

The government arrested Petitioner on 10-8-2014.  Less than 2 weeks later, Marquis Tymes was trying to con Petitioner into going to get Tymes' dog, in order to try to pin his drugs on Petitioner.  Petitioner didn't fall for the scheme.  Tymes took care of his own dog.

Tymes made a proffer to the government believed to be about 3 months after the arrest.  In this initial proffer, Tymes tried to pin the "doghouse powder" on Petitioner.

The government wouldn't hear of it.  Susan Redmond demanded that Tymes change his proffer to admit that the drugs belonged to him.  Tymes folded, admitting that the powder cocaine found under the doghouse, and all of it, in fact belonged to him.  The exact time of the second proffer is not known, but it had to be before Tymes pled on 4-16-15, simultaneously agreeing to cooperate with the government.

That's why Redmond, lead counsel for the government, wouldn't call Tymes as a witness at trial.  She had personally demanded (whether or not by and through defense counsel) that Tymes change his story to say the doghouse powder was his.  Petitioner knew this and could have exposed Redmond's fraud to the jury, by proving through Tymes own mouth that Redmond extracted a contrary story out of him, through coercive means.

From the outset, Redmond was trying to tell two utterly contradictory stories about who OWNED the drugs.  Forget about any other charges for the time being.  Redmond was trying to tell one story in one court proceeding, and another story in a different court proceeding, despite the fact that the stories were inherently contradictory.  This is textbook prosecutorial misconduct.  A prosecutor is not permitted to present two or more contradictory sworn statements to separate (or even the same) triers of fact, and argue that both of them are the truth.  MOONEY V. HOLOHAN, 294 US 103 (1935);  GIGLIO V. US, 405 US 150 (1972).

Redmond knew her story was false.  That's why she concocted the lies about constitutional rights in her closing argument. Actually, technically, her words weren't lies.  Here's what she said on TR III, page 101:

8  Let me start here.  The defense started -- actually,
9  they didn't start.  They raised the issue of why a codefendant
10  did not testify.  We have something in this country called constitutional rights.

Petitioner objected.  Ms. Redmond argued at TR III, pg. 102, line 7, "He [Tymes] has the right not to testify."  This is true but deliberately misleading to both the court and jury.  Ms. Redmond was trying to mislead the jury into believing that Tymes was unavailable, because he pled the 5th.

Tymes didn't plead the 5th.  By the change of plea 4-16-15, Tymes was already Redmond's puppet on a string.  He would have testified if Redmond had asked him to testify, based on the cooperation agreement he had with the government.  Tymes was a

-------------------------------------------------------------------------------------------------------

USELESS bribed witness because Tymes had already stated, in his proffer, that the drugs were his. If he took the stand in front of the jury, Duraski could be counted on to examine him as to not one but TWO contradictory statements about the drugs. Tymes could be forced to say that his original story denied that he owned the doghouse cocaine, but that in the second proffer, he admitted they were his.

Under the spotlight of cross examination, Tymes would admit that his second story, saying the drugs were his, was DEMANDED AND RECEIVED by none other than the lead attorney on the prosecution team - Ms. Susan Redmond. She would be severely embarrassed for her perfidy, and no lawyer enjoys embarrassment.

Most potent and devastating for the government was the fact that Tymes' contradictory statements weren't turned over by the government. Redmond was arguing and advocating to the court with the intent of proving a position that SHE HERSELF had rejected, and forced Tymes to abandon under the threat of severe retribution.

This is a violation of BRADY V. MARYLAND, 373 US 83 (1963) and GIGLIO, supra, a mile high and a mile wide. BRADY at 373 US 87-88 says:

> [3] We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

> The principle of MOONEY V. HOLOHAN is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but WHEN CRIMINAL TRIALS ARE FAIR; our system of the administration of justice suffers when any accused IS TREATED UNFAIRLY. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts." A prosecution that withholds evidence on demand of an accused which, if made available, [383 page 88] would tend to exculpate him OR REDUCE THE PENALTY helps shape a trial that bears heavily on the defendant. That casts the prosecutor in THE ROLE OF AN ARCHITECT of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not "the result of guile," to use the words of the Court of Appeals. 226 Md, at 427.
> (emphases added)

Usually the government lawyer has enough sense not to extort conflicting testimony from a witness, and then try to blindside defense counsel with two contradictory stories in the same litigation, in separate proceedings. Not this time! BRADY requires no proof of guile or bad faith by the prosecution. But how can it be "good faith" for the government to tell two incompatible stories, in order to maximize punishment against two separate defendants in a multi-defendant case?

Perhaps this is as good a time as any to show the truth about these longsuffering fellow defendants, who had the misfortune of being forced to rot in county jail for some 18 months. First look at page 1 of the Presentence Report (PSR), which says that the PSR was prepared for Judge Blackburn, by Terrence N. Marshall. The current sentence date is shown as 9-23-16. The date the report was prepared was 8-26-16. The date the report was REVISED was 9-12-16 - less than 2 weeks before the sentencing date. Consider the following chart prepared from information derived from page 5 of the PSR (Presentence Report).

| NAME | PLEA DATE | SENTENCING DATE |
| --- | --- | --- |
| Earl Wilson | 3-17-15 | 9-23-16 |
| Kenosha Williams | 3-31-15 | 9-23-16 |
| Marquis Tymes | 4-16-15 | 9-23-16 |
| Curtis Caffie | 5-6-15 | 9-22-16 |
| Dewayne Thomas | 5-28-15 | 9-22-16 |
| Ernest Stromer | 8-20-15 | 9-22-16 |
| Bobby Norman | 10-30-15 | 9-23-16 |
| Sanquez Bivens | 9-22-16 | 10-4-16 |

Mr. Marshall completed the revised PSR 9-12-16. Judge Blackburn was removed as presiding judge the next day.

'¬e government in its Appellate reply brief to the 11th Circuit cites 18 USC 137 for the proposition that "District judges may by ¬rder, or consent transfer cases between themselves." That's all well and good - until you note that on the DAY AFTER

4

-----------------------------------------------------------------------------------------------------

this PSR was prepared, Judge Blackburn was removed NOT BY AN ORDER of either judge, NOT BY A RULE, and most certainly not by CONSENT OF THE PARTIES, but rather by what amounts to a note in the docket by "ajr."

If the government chooses to cite authority, they might first want to see if they have complied with that authority. There are good reasons for requiring an order. A simply "docket text order" might say something to the effect that "due to medical issues requiring protracted absence, undersigned is re-assigning this case to Judge X." In that case, we at least know who did the deed, and why. At least we have a docket number, a means of reference understandable to the public.

Everything stated on the record about the absence of Blackburn is pure speculation, to any outside observer at the very least. No district judge of the Middle District of Alabama ever entered any order or writing stating reasons for the transfer of the case from one judge or another. Nor did this Honorable Court enter an order ASSIGNING HIMSELF to the case. If that worked, why couldn't any judge simply take over the case of another judge, by entering an order in that case? Nor did Judge Kallon set forth the basis for his apparent presuppositions as to the reasons Judge Blackburn was no longer assigned to the case.

Susan Redmond procured the reassignment for her own nefarious reasons. Here is how we can know. First, disregard the other 8 defendants, for the present time. They had to rot in jail because of Susan Redmond's corrupt practices, including but not limited to the extortion of perjury from defendants, in exchange for "leniency." Otherwise, why not sentence them promptly and send them off to prison? Jail is far more harsh than prison.

We know that Redmond had motive to get rid of Judge Blackburn. We have multiple bases for believing that she was displeased with Judge Blackburn. Redmond had to be admonished for rolling her eyes and otherwise displaying visible disagreement with Judge Blackburn's rulings, IN FRONT OF THE JURY. At TR I, pg. 161, we have the following colloquy from a bench conference:

```
1    THE COURT:  The first thing I want to say is be careful
2    about making eye - being upset at my rulings where the jury can
3    see.
4    MS. REDMOND:  I'm sorry.
5    THE COURT:    Okay. I mean, don't roll your eyes and
6    look at another --
7    MS. REDMOND:  I apologize.
8    THE COURT:  another one of your colleagues when I make a ruling.
```

Despite this admonition and opportunity to learn a lesson, Redmond continued her disagreements by claiming, at page 5 of her response brief (by and through AUSA Sandra J. Stewart) in USA v. Reynolds, 11th Circuit Appeal No. 16-16392-BB, that:

> ... The testimony at trial lasted less than a day-and-a-half, due in some part to what the government maintains were numerous incorrect evidentiary rulings and comments by Judge Blackburn that interfered with the Government's ability to fully present its case to the jury.

Everyone has a right to argue legal error, that isn't a problem. Petitioner is not objecting to the government making its arguments to an appellate court. Petitioner is simply showing that Redmond was upset with Judge Blackburn, and had a motive to commit unlawful and unethical acts to get a judge who had no memory of her misbehavior at trial.

Petitioner is not, as the government suggests, making unverifiably representations to this court. By all means, ask the government for any and all proffers from Tymes. Bring Redmond as a witness - yes, a witness - and ask her to explain why Tymes' second proffer tells a story diametrically opposed to the first one. Furthermore, call Tymes as a witness and ask him to state, under oath, why his story changed, concerning who possessed the drugs.

Now, look at the PSR for Tymes, and see what it says. Did Redmond tag Tymes with OWNERSHIP OF the same drugs she tagged Petitioner for? If so, what's her theory that the drugs belonged to both people? Look at the language of the proffer and the PSR. Petitioner can see his own PSR. How about letting Petitioner see so much of the PSR as sets forth the drug amounts? Actually, since it is an open secret that Tymes testified against a co-defendant, how about letting Petitioner see all matters in the PSR EXCEPT those determined by an IN CHAMBERS review to be either irrelevant to Petitioner's case, or such that Petitioner should be for other reasons denied access?

This need not and should not involve an undue expenditure of public funds. Petitioner would be happy for Tymes to testify via videophone, as suggested by 42 USC 1997e (f) for prison conditions litigation. There is no reason to force Tymes to the rigors of travel in chains, or to require the taxpayers to pay the expenses. At this prison, we have a videophone in the hallway. Presumably at his prison of confinement a similar situation prevails.

It gets worse. Redmond wasn't merely trying to present perjurious testimony about drugs and drug quantities. She KNOWINGLY AND WILLFULLY used perjurious testimony about the guns. Here's how we know.

At trial, Sergeant Kevin Jacks testified about the presence of weapons. When asked about weapons, he testified that there were "approximately" two weapons. We'll soon understand why he said this, and why this proves that he was corrupt.

Marcus Webster was the case agent. That means that despite the fact that Petitioner's Attorney Russell Duraski invoked "the rule," requiring sequestration of witnesses, Webster got to stay in the courtroom and watch the testimony. Webster can listen to all the testimony, and testify last, based on all the testimony he heard from the witnesses. No other witness, save potentially a defendant, has this privilege.

Any criminal investigation in which "approximately two" guns are found is hopelessly compromised. Agents who find

b

-------------------------------------------------------------------------------------------------------

contraband have a duty to document their finds by photographic evidence, as they find them. They are not allowed to steal guns and take them home. It should go without saying that they are not allowed to "plant" guns or drugs. Nor are government agents allowed to re-arrange items actually found, and then swear they found it that way, or use any manner of artifice to try to give the impression they found it that way.

Sgt. Jacks testified that he found 2 separate bags of marijuana, one in a peanut container on the coffee table, and one laying on the coffee table. TR II, pg. 20. He says he found the Ruger on the couch. Id.

We know where Sgt. Jacks was at when the raid commenced, at approximately 6:00 AM. He was at the back side of the duplex. He testified that he watched the Petitioner make his hasty departure out the back door of 269 JMA. TR II, pg. 17. He further testified that he pursued Petitioner and apprehended him.

Petitioner had a legitimate reason to be at 269 JMA, which he intended to present by Wilbert Tymes. Specifically, Petitioner did construction work for Marquis Tymes, and 269 JMA was the location at which the construction equipment and supplies were stored. Shortly after Petitioner informed his lawyer of this intent, the government got word to Marquis Tymes, that Wilbert Tymes would be criminally investigated if he testified in Petitioner's trial. Thus the government intimidated Petitioner's witness, and denied him his constitutional right to call witnesses favorable to the defense.

"Substantial government interference with a defense witness' free and unhampered choice to testify violates due process." UNITED STATES V. HENDRICKSEN, 564 F. 2d 197, 198 (5th Cir. 1977) WEBB V. TEXAS, 409 US 95, 97-98 (1972) UNITED STATES V. HAMMOND, 509 F.2d 1008, 1012-13 (5th Cir. 1979) See also id. at 1012, collecting cases.

Defendant in claim four of his amended petition made his claim and the facts supporting it abundantly clear. Petitioner plainly alleges that the government squelched the Petitioner's ability to present relevant testimony from Wilbert Tymes. Yet the government response is A DEAFENING SILENCE! Presumably they hope this court won't notice that glaring omission.

In the meantime, a swarm of officers (state, federal, and/or hybrid) had deceded upon the duplex, 269/271 JMA. Petitioner didn't go back into 269 JMA and thus has no first hand knowledge of exactly what happened. However, it is safe to say that the officers were looking for drugs and guns. That was the whole purpose of the raid. Petitioner and Sgt. Jacks were attending to their respective business. The other agents were attending to theirs.

It was a substantial period of time before Sgt. Jacks FIRST went into the house. He didn't go in during the initial entry. He can't testify as to what happened during that period of time. By the time Sgt. Jacks entered 269 JMA, the premises had already been compromised by corrupt officers.

Sgt. Jacks claims to have seen a Ruger pistol and a holster on a couch. He claims to have seen two separate packages of marijuana. That's all he claims that he personally saw.

Mr. Webster can't tell his whoppers AT TRIAL. The JURY saw Jacks tell HIS story. Webster cannot, with the slightest credibility, get on the stand and tell the jury the outrageous lies he told at sentencing.

What did Webster say at sentencing? He said that he saw TWO guns, a holster, marijuana, scales, baggies, and crack cocaine, along with Petitioner's government issued ID, ON THE COFFEE TABLE. This is necessarily a "set-up" by dirty cops. Don't forget, Judge Blackburn already told the government that they couldn't trot in evidence by an agent OTHER THAN the agent who ACTUALLY FOUND the contraband. TR II, pg 21, 22. Furthermore, she said that the "finds" had to be documented AS THEY WERE FOUND, and not otherwise. Id.

This is yet another breathtaking violation of BRADY/GIGLIO, common decency, and legal ethics. No one has a right to intentionally flout the rules of a court. Federal prosecutors have a special duty to honor the court's rulings. Yes, the federal government can argue its case, vigorously. The government can appeal orders it does not like, generally speaking. The government can't just FLOUT the court's rulings.

Trying to deceive to a jury is like trying to sneak up on a flock of wild turkeys. It matters not that some have their heads down to eat, at any given time. They have about a dozen sets of keen eyes. When the need arises, the deliberation time for wild turkeys is measured in milliseconds.

The government presented evidence from Monica Talley claiming she bought drugs from the Petitioner. Judge Blackburn said it was at or near the worst she'd seen in 25 years on the bench. TR II, pg. 146.

7

-------------------------------------------------------------------------------------------------------

Petitioner never saw a copy of his PSR. Nothing in the record suggests that he saw it or went over it. The fact is, he didn't. Petitioner admits that he discussed the PSR with his lawyer, over the phone.

The PSR does not so much as INCLUDE THE NAME of Monica Talley! None of her supposed "buys" are included in the PSR. Yet Petitioner received none of the notice required by BRADY and GIGLIO. No, the truth of the matter is far more sinister.

The trial took place June 20-22, 2016. The PSR, by its own terms, was "prepared" 8-26-16, more than 2 months after the jury verdicts.

The government feigns concern about the other defendants, rotting in jail rather than going to prison, which is admittedly a far less harsh place of confinement. But how pray tell was the government going to GET A SENTENCING of defendants WITH NO PSRs?

The fact is that the government's representations in this regard are a fraud upon the court. BTW, please look at all the other PSRs, and see what dates their PSRs were completed and/or "revised." In fact, Petitioner would like to see copies of all of them, with such redactions as the court deems appropriate. Why should the Petitioner believe that the government had done anything to prepare for sentencing of the other defendants, in a timely manner, when the government has shown such shocking bad faith, and dishonesty to the court, on his own case?

Please note the tight grouping of the sentencing of the other defendants. All these other defendants were sentenced by a "new" judge. Judge Blackburn sentenced nobody in this case.

Deceitful and dishonest manipulation of the court records, for the purpose of getting a judge unfamiliar with the government's perfidy, is BRADY/GIGLIO material and must be disclosed. Furthermore, the government owes each and every one of the other defendants, AND THEIR LAWYERS, a PROPER AND THOROUGH disclosure of the unlawful or unethical acts of ALL THE GOVERNMENT PROSECUTORS, AGENTS, AND EMPLOYEES, WHATSOEVER, who had anything to do with this case.

Jacks is a deceiver, at best. That's why gave the singularly dishonest answer that there were "approximately" two weapons. Webster is an unmitigated liar, a perjurer in the first degree. It is a near certainty that he knows who set up the coffee table for the deceitful and highly incriminating photograph used at sentencing. Ms. Redmond has a LEGAL DUTY to know and disclose all such exculpatory facts and information.

---------------------------------------------------------------------------------------------

The PSR contains yet another marvel. Petitioner was tagged for 6 controlled buys by Curtis Randall Caffie. This was added to the "relevant conduct" of Petitioner. Yet Petitioner saw nothing of this, at any time. This was mostly not alleged in the indictment, although there is some date overlap that the government might rely on, to argue that the government hasn't trashed out the Petitioner's 5th Amendment right to a grand jury indictment.

Where are those drugs? They are nowhere to be found. There was no foundation laid or attempted at trial, concerning any controlled buys from CAFFIE. The allegation was that Caffie was a co-conspirator. So how could he also be a confidential informant for the government?

Who stole the drugs? That is unquestionably BRADY/GIGLIO material. If the government agencies that performed the investigation and made the raid has KNOWN THIEVES in the ranks, the pertinent facts must be disclosed. If the government has agents so MONUMENTALLY INCOMPETENT that they can't keep their hands on a few grams of cocaine, that fact must be likewise disclosed.

Furthermore, either they have done an investigation of these thefts or they haven't. If they know that thieves are running amok in the ranks of the vaunted Federal Bureau of Investigation, the Police Department of the City of Montgomery, Alabama, and perhaps also the US Attorney's office, that's BRADY/GIGLIO material. If the government agencies involved are too corrupt or incompetent to weed out the thieves and evidence-planters, that's BRADY/GIGLIO material. If the government figures out who is a liar and a thief, they have a duty to so inform ALL persons who have been convicted and/or lost their liberty due to the testimony, or POTENTIAL OR THREATENED TESTIMONY, of that corrupt officer.

It means nothing that the individual PLED GUILTY. INNOCENT people plead guilty all the time, simply because they can get 10 years on a plea, and they're threatened with LIFE if they exercise their CONSTITUTIONAL RIGHT to a jury trial. Furthermore, the presence of crooked cops reduces the "worth" of a case. A case that might net 10 years, with honest officials, may be worth no more than 2 years if the cops are so compromised that a guilty verdict is doubtful.

A common law maxim says it is better for 19 guilty to go free than for one innocent man to be convicted. How can this tenet of the law be remotely respected, when the jury's opinion about a criminal charge means, essentially, nothing at all?

That's not the half of it. Judge Blackburn said she would not allow testimony about anything until the THING was admitted. TR I, pg. 5. The government never introduced any CRACK COCAINE into evidence - none! Yet on the PSR, that's the main part of the drug quantity. Look at PSR page 12. The cocaine supplied 49.30 kilograms of marijuana equivalent. That calls for a Base Offense Level of 18.

The PSR uses 20.45 grams of cocaine base (crack cocaine) to arrive at 73.02695 kilograms of marijuana equivalent. Added together, that takes the Petitioner to more than 100 kilograms of marijuana equivalent, corresponding to a Base Offense Level of 24. That's EIGHT POINTS more than any court could RATIONALLY find, using Judge Blackburn's rules. No wonder the government wanted a new judge. They just couldn't prove their case otherwise - as to LIABILITY or as to the DESIRED PUNISHMENT.

It gets worse - much worse. The PSR adds 2 points for guns and 2 points for running a drug manufacturing or distributing premises. The PSR talks about controlled buys at 269 John Morris Avenue (JMA) drugs, scales, and firearms.

But did we really have any controlled buys at all? Consider this abbreviation of a chart at page 6 of the PSR, listing all of the alleged "buys" from Petitioner. There are 15 alleged "buys" from Tymes, and 6 alleged controlled buys from Petitioner. Who was the controlled informant buyer? None other than Curtis Randall Caffie. On the one hand they claim he is a co-conspirator, on the other hand they claim he is a CI drug buyer. Here is the information provided.

| DATE | LOCATION | DRUG/FIREARM | PRICE |
|---------|----------------|-----------------|------|
| 6-4-12 | 200 block JMA | .4 gram cocaine | $20 |
| 5-23-13 | 100 block JMA | .5 gram cocaine | $20 |
| 2-4-14 | 200 block JMA | .3 gram cocaine | $10 |
| 4-10-14 | 200 block JMA | .4 gram cocaine | $20 |

9

------------------------------------------------------------------------------------------------

| 5-22-14 | 200 block JMA | .4 gram cocaine | $20 |
| 9-26-14 | 269 JMA | 1.9 grams cocaine | $10 |

On page 7 we're told that FBI Special Agent Dennis Reed says all buys went to ADFS for lab analysis. The lab determined that it was 3.9 grams of cocaine. That matches the numbers above.

Look at the following short chart of the indictment.

| DATE | SUBSTANCE | OFFENSE |
|------|-----------|---------|
| 4-10-14 | powder cocaine | possess with intent to distribute |
| 5-22-14 | powder cocaine | possess with intent to distribute |
| 9-26-14 | marijuana | possess with intent to distribute |

The last three dates of CAFFIE'S alleged buys matches up with the three "controlled buy" counts of the indictment. In the PSR, FBI Agent Reed claims it was all cocaine. If this is true, on 9-26-14 someone must have been very generous, seeing that they (allegedly) sold about 5 times the quantity for half the money.

Did they buy marijuana AND cocaine on 9-26-14? If so why isn't the marijuana listed in the PSR? Furthermore, we're dealing with "facts" with respect to which the Petitioner was given no notice at all, by the indictment. The story presented at trial is conspicuous by its absence.

Not one word of this rubbish is worthy of credit by an individual considering the graver matters of life. Not one word of this would be believed by someone who could not afford to give credit to lies and fraud.

The government can't make its mind up about WHO sold WHAT to WHOM for HOW MUCH. They put on a dog and pony show to the jury, which the jury to their everlasting credit didn't buy - at least as to those drug counts that went to the jury.

The government claimed at trial that Monica Talley was the buyer. In the PSR they've dropped her like a hot potato, and picked up Caffie. However, Petitioner never laid eyes on that document, which was dropped on Petitioner's lawyer right before sentencing. Petitioner and his attorney had no time for anything but the basic objections.

It gets worse yet. Look at page 8 of the PSR. There the PSR says that the following items were seized from 269 JMA.

1)  Ruger pistol
2)  Cobra pistol
3)  4 magazines for the pistols
4)  24 rounds of live ammunition
5)  142.2 grams of cocaine from under the doghouse
6)  2.45 grams of crack cocaine
7)  96.5 grams of cocaine from 269 JMA
8)  the personal identification of Petitioner

Who stole the magazines and the live ammunition? We'd really like to know, because if any of the government witnesses either WERE the thief, or KNEW who the thief was, we'd like to know. Everybody understands that proof that a GOVERNMENT WITNESS is a thief is exculpatory evidence. Thieves can't be trusted to tell the truth.

It is however no less important to know if any of the government witnesses BECAME AWARE of thefts or "losses" of government evidence, and what they did about it. The catchers of criminals have a paramount duty to police their own ranks. Ignoring thefts or incompetence sufficient to allow evidence to go missing, for whatever reason, calls for a thorough investigation. If any investigation was done, the results were BRADY/GIGLIO material that should have been disclosed. The results of such an investigation tends to cast light on who, in the chain of custody or having access to a defendant's premises, lacked full and complete trustworthiness.

The crack was never introduced into evidence, at any time. Once again the government is showing its MOTIVE for sneaking down to the clerk's office, to prevail upon a clerk's office employee to exercise power which, by statute, belongs to judges alone, either by and through an order, or by and through an established rule. Here, we have neither.

This version of the facts contradicts what Sgt. Jacks testified in court. Sgt. Jacks said that he was the discoverer of the

10

---------------------------------------------------------------------------------------------------------------

cocaine, and that he found it under the doghouse. TR II, pg 28-29. Exhibit 3-A. It was in multiple bags, but Sgt. Jacks said plainly that he got it from under the doghouse. If he ACTUALLY got it from inside 269 JMA, that would be quite helpful to the government's case against the Petitioner. He didn't say that.

Ok, who contradicted Sgt. Jacks by saying 96.5 grams of the cocaine was found in 269 JMA? This is BRADY/GIGLIO material of the first order. When and how did the claim about the 96.5 grams of powder cocaine LOCATED in 269 JMA arise? Who first uttered this perjurious nonsense, who passed it along, and when? Petitioner has a right to know who is fabricating stories entirely contradictory to the testimony elicited by sworn government witnesses at trial. At the very least Terrence N. Marshall, US Probation Officer, is a necessary witness at the hearing on this 2255 petition. He got a lot of information utterly incompatible with the trial, and he had to get it from SOMEWHERE. We need to know his sources, for preparing the PSR.

Consider now the testimony of Rachelle Shelton, Forensic Scientist from the Alabama Department of Forensic Sciences. She says she's "analyzed approximately 10,000 cases." TR II, pg 41. She tested it and found it to be cocaine. Id. at 44. She received it from Sgt. Jacks. Id. at 43. Now look at this colloquy about the drugs, from page 43:

17   Q.  And is that exhibit in the same condition now as when you
18   first received it?
19   A.  It's been opened since we returned it, but it appears that
20   it's the same evidence.

Ms. Shelton must be a truly amazing expert. She can tell JUST BY LOOKING that a package opened BY AN UNDOCUMENTED THIRD PARTY, FOR UNDOCUMENTED REASONS, is STILL THE SAME AMOUNT OF THE SAME SUBSTANCE! That's quite contrary to the principle laid out by Judge Blackburn at TR I, pg. 44, lines 7 and 8. An officer can testify to what he or she saw, not to what other officers allegedly saw. At TR III, pg. 121, in preparation to send the alleged drugs back to the jury, the following colloquy took place:

2   THE COURT:  They just like to see it. It's the one and
3   only time jurors ever get to see drugs.
4   MR. GEER:  Sure.
5   MS. REDMOND:  And no problem. But remember that we
6   have the individual little bags in there. And that's all we
7   wanted to make sure --
8   THE COURT:  Are they not sealed?
9   THE CLERK:  Everything's sealed.
10   MS. REDMOND:  No, we opened it.
11   THE CLERK:    The packets, though.
12   MR. GEER:  Well, the larger bag.
13   THE CLERK:  Well, the larger bag --
14   MR. GEER:  We know there are seven little bags in
15   there.
16   THE COURT:  But is the larger bag sealed?
17   MR. GEER:  It is not. It was cut open.
18   THE CLERK:  The larger bag, right. But the smaller
19   bags are sealed.

Ms. Redmond ADMITS ON THE record that "we opened it." Who's "we?" Proof of the chain of custody now REQUIRES the testimony of Ms. Redmond, or at the very least a competent witness to her activities. She didn't disclose herself as a material witness. Plus, she never gave a valid reason for opening the package and re-sealing it. This gives her a perfect opportunity to steal some, or to set up a claim that some of it came out of 269 JMA, or commit a variety of other nefarious acts. All this is BRADY/GIGLIO material, that was not disclosed.

This also disqualifies her and whoever constitutes "we" in line 10 above, from acting as counsel in the case. Absent special circumstances, an attorney is allowed to be a witness and an advocate in the same case. Alabama Rules of Professional Conduct 3.7(a); PUTNAM V. HEAD, 268 F.3d 1223, 1246 (11th Cir. 2001) Nor is Ms. Redmond allowed to declare "King's X" to a subpoena for her testimony, simply because she is the AUSA in the case. She wants to use that powder to punish AARON KEITH REYNOLDS, in derogation of the teachings of NELSON. She opened the bag. She's a material witness. It becomes her duty to step aside and allow an untainted attorney to prosecute the case, at any and all proceedings including trial, sentencing, and any post-sentencing proceedings.

11

--------------------------------------------------------------------------------

Look at TR I, pg. 44. Judge Blackburn agrees that an officer can testify to what they saw in execution of search warrants, not what other officers saw. Ms. Redmond is trying to get this court to accept testimony concerning HER ACTIONS, from some other witness. Some other witness, who didn't see Ms. Redmond open the packaging, can't testify as to what happened while the package was opened.

It gets worse yet. Look at page 8 of the indictment. We are told that Petitioner agreed to an FBI interview, on 10-8-2014, the day of Petitioner's arrest, yet the recordings and transcripts are unavailable. TR II, pg 129-130. In other words, one of the biggest and most powerful investigative agencies in the world can't preserve and keep track of an audio file it created and stored on computer. Petitioner watched them set up the computer to record the interview. Conveniently, Mr. Raymond Smith, Jr., says that his partner was THE LATE Jim Grant. Voila, there is nobody available to contradict Smith's version of the interview - unless Petitioner gives up his 5th Amendment right not to be a witness against himself.

Consider the following verbatim language from paragraph 23 on PSR page 8:

    ... Reynolds described the "Vineyard" as a place where drug dealers "come in, set up shop any given
    night and where buyers could go to any crowd and buy drugs." ...

Consider the illogic of on the one hand claiming to have "lost" the recordings and transcripts, but to be able to regurgitate VERBATIM certain statements allegedly made by Petitioner. Did these incompetent officers NEVERTHELESS have a photographic memory? This is even more implausible when one considers this language to be a fair summary of certain allegations on the first page of the indictment.

Is it not interesting to anyone else that Petitioner allegedly provided a fairly accurate summary of certain allegations of the indictment, but they don't have this evidence? This too is BRADY/GIGLIO material of the highest order. This interview wasn't LOST - the government just lied about it, so they could pin any story on Petitioner that they cared to pin on him, leaving Petitioner with no way to rebut except to give up his 5th Amendment right not to be a witness against himself.

This is shameless fraud, used to "whipsaw" Petitioner into an untenable position. EVERY officer who had anything to do with this interview, or the recording, or storage, or logging of evidence, should be disclosed to Petitioner, along with everything they had to do with this fraud. If any officers dealt with the evidence, but didn't participate in the fraud, the disclosure of those names and contact information, plus all relevant evidence they have, is even more important. If some law enforcement officers are liars and frauds, and others are honest and furthermore in possession of evidence contrary to what the liars have to say, the government has a duty to fully and fairly disclose this information to ALL the affected defendants.

That's not the half of it. This isn't the first rodeo for these malicious and dishonest officers, or for Ms. Redmond. They've pulled the same stunt before, calming and reassuring a nervous defendant with assurances that their testimony can't be altered, BECAUSE ITS RECORDED!!! Then, having deceived the defendant into giving up legal rights, on false pretenses, the officers - and Ms. Redmond too - lie to the defendant about the recordings being "missing," thus giving these officers license to tell the most outrageous lies to the jury. Who can discredit them? The defendant will get crucified if he takes the stand, and Ms. Redmond will never VOLUNTARILY turn over the recordings.

Mr. Smith goes on to claim that the Petitioner ADMITTED to the guns being in his house. The "conveniences" never end. The jury gets to hear a recently retired FBI agent claim Petitioner ADMITTED that the guns were in the house, and he knew it. TR II, pg. 133 He claims that Petitioner first said he lived in 271 JMA, then changed his story to say he lived in 269 JMA. TR II, pg. 132. Petitioner is FIRST blasphemed as a liar, and minutes later the jury is told that he essentially CONFESSED TO THE CRIME ALLEGED IN COUNT 50!

This trick necessarily requires a conspiracy on the part of crooked cops. By policy the interview has to involve two officers. Both of the officers have to have at least a tacit agreement not to tell the defendant about their perfidy.

All these crimes break down when the disinfectant of sunlight is poured upon them. For this reason, Petitioner is requesting the names and contact information of everyone involved in his case, plus the dockets and all docket items, and current contact information, of all persons who have been prosecuted (whether or not successfully) with the participation, however slight, of any of these officers

-----------------------------------------------------------------------------------------------------

Crooked cops get comfortable with their deceitful tricks. When crooked cops figure out how easy it is to get a conviction on a fabricated confession made without any audio recording, they play the same trick on a regular basis. These frauds work reliably - at least until someone starts doing the work of asking questions, making charts and summaries, etc., with respect to the tricks played on other defendants. When the history of crooked cops is set forth in organized and logical fashion, their corrupt MODUS OPERANDI becomes as plain as day.

## III.   FAILURE TO RETURN THE INDICTMENT IN OPEN COURT

The government devotes all of three sentences, at page 9 of its brief, to claiming that the Petitioner has nothing at all, with respect to the failure to return the indictment in open court.

There certainly is no proof that the superseding indictment, alleging crimes against Petitioner, was returned in open court. Anyone with access to PACER (Public Access to Court Electronic Records) can find indictments upon which the date of return in open court is plainly written. The return of an indictment in open court serves a very important function. It ensures that the government didn't simply "phony up" an indictment altogether, and that the government didn't switch out the real indictment with an indictment doctored to read more to the government's liking.

The government has shown no signs of repentance. The government hasn't said that the failure to return in open court was an innocent oversight, OR that it was really returned in open court, and the court reporter has the audio recording stored away to prove it. The government doesn't point to any part of the docket to show that the return in open court, necessarily a matter of record, was actually placed on the docket, and Petitioner just overlooked it.

This isn't just about the Petitioner. This is a request for the government to break off its sins with righteousness, to do justice going forward. If they don't want to deal with these issues on 2255 petition, or if they don't want the disapproval of the public, they can simply start turning square corners with the world. They should understand that when an individual's liberty is at stake, all the stakeholders - including the taxpayers who will pay the exorbitant costs of some of the most ineffectual "corrections" in the world - will expect that the record actually reflects that the government secured its conviction in compliance with all the rules.

Who writes and amends the Federal Rules of Criminal Procedure (FRCrP)? Is it not members of the sitting federal judiciary? If the federal judges who operate under the rules don't like the rules, can they not change them (after public notice and comment, of course)? The FRCrP is replete with edits, explanations for the reasons and substantial changes of practice, etc. If the rules are good, why not enforce them reliably, evenhandedly, and fairly? If the rules are bad, why not amend the rules?

If the federal judiciary wants the people to "just trust the government" why not edit Federal Rule of Criminal Procedure 6(f), to take out the requirement of return in open court? If "the government" never does wrong, why spend the money and time on such formalities? Why not let the Assistant US Attorney openly hand carry indictments to the clerk's office for filing, with the foreman's signature redacted, on his or her word that the grand jury voted a "true bill" on precisely that indictment? Aren't US Attorneys and Assistant US Attorneys "officers of the court," expected to maintain high ethical and legal standards?

All of Petitioner's punishment hangs by the slender thread of Count 50, the "felon in possession" count. That was the "hook" by which the government worked its "heads I win tails you lose" magic on the Petitioner. If that's gone, everything's gone. If that was not a valid guilty verdict, then the judgment and conviction order was invalid, the incarceration of Petitioner was unauthorized, every punishment whatever was unauthorized. Loss of Count 50 doesn't mean "time served." It means the Court must enter an order of immediate release and full exoneration for Petitioner. Get him out of prison IMMEDIATELY!!

The government loves their sly back door ways of keeping a conviction. Their problem this time is that THEY have a "heads I win tails you lose" situation, with respect to Count 50 - one of their own making.

If the indictment was never returned in open court, then one might say the government perhaps didn't present ANY evidence on this count. However, if the government presented evidence, it had to be SOME evidence, sufficient to support the allegations of the indictment, Count 50.

Count 50 alleges TWO guns. As we have already seen, Sgt. Jacks was in on the conspiracy to run in a TOTALLY STAGED SCENE in which the government has pictures of TWO GUNS, marijuana, crack cocaine, scales, and baggies on the coffee table CONVENIENTLY with the Petitioner's STATE ISSUED ID!!! Someone got Petitioner's ID (from where we are never truthfully told) put it on the coffee table, arranged everything nicely, and took a photograph.

13

---------------------------------------------------------------------------------------------------------------

Based on the trial record, that are only TWO ways to associate Petitioner with the Cobra pistol. Nobody else, at any time, tried to say they found the gun ANYWHERE. First, the only testimony about where the gun was FOUND was from Marcus Webster, the case agent, at SENTENCING. Second, we have the claim that the Petitioner just spilled his guts, telling one story after another about where he lived, admitting that he lived in 269 JMA, admitting that the gun was in 269 JMA, and admitting that he knew the gun was there.

Where is the officer who allegedly ORIGINALLY found the other gun? Ms. Redmond, indeed the whole US Attorney's Office, JUST CAN'T FIND HIM! TR II, pg. 175. Once again, how very convenient that the officer who staged the crime scene just can't be found.

Ms. Redmond knows this "guns on the coffee table" is fabrication of evidence, pure and simple. That's why Ms. Redmond sandbagged the utterly perjurious testimony of Marcus Webster, for use at sentencing.

The government has another problem. From the moment they could not find their evidence fabricator, they had a duty under BRADY/GIGLIO to disclose ALL RELEVANT INFORMATION about this lawless person to PETITIONER. This includes their knowledge and/or investigation of his bad acts, the true and correct reason for his unavailability, their last known contact information for him, etc. This they did not do. The government acts as if they have a LEGAL RIGHT to sandbag their frauds, to evade the watchful eyes and discerning ears of the jury - in order to present their information at a proceeding in which all sorts of hearsay and otherwise inadmissible evidence is considered, (assuming it is "reliable," whatever that means) with a burden of "preponderance of the evidence."

OK, assume arguendo that the indictment is bona fide, even if not returned in open court. Assume the government did in fact present SOME EVIDENCE upon which the indictment was based. Assume the government did not ABSOLUTELY AND TOTALLY trash out the Petitioner's 5th Amendment right to grand jury indictment.

In that case, the government runs its self straight into the manufactured crime scene and the perjurious testimony of Marcus Webster. The use of perjury to obtain an indictment is a violation of due process as well as the 5th Amendment, universally condemned for a host of good reasons. A defendant's right to due process is violated when "the prosecution's case includes perjured testimony and ... the prosecution knew, or should have known, of the perjury." UNITED STATES V. AGURS, 427 US 97, 103 (1976); see also PHILLIPS V. US, 849 F. 3d 988, 993 (11th Cir. 2017) Yet the government acts as if they can freely use their lying witnesses AT THE GRAND JURY, and then coyly say they "can't find" their witness when the time comes for trial, before a federal judge and 12 of Petitioner's peers.

This is a classic ploy to cover for criminal behavior on the part of government agents. Here, the government hopes the Defendant won't realize that the grand jury testimony has just come FRONT AND CENTER, with the government having a duty to disclose that their "absent" witness committed PERJURY to procure the ONLY count upon which the government has a "hook" into the defendant, and ALSO to turn over all evidence in the possession of OR AVAILABLE TO the government, that might allow the defendant to "connect the dots."

So which is it? Did the government present perjured testimony to the grand jury, or did the government "phony up" Count 50? Did the grand jury EVEN MEET on the day the government claims it got the superseding indictment?

This sounds like an outrageous suggestion. OK, if they did in fact meet, provide the billings of the court reporter to show it. Turn over the grand jury transcripts. Let us see what actually happened. We know that Petitioner's conviction was NECESSARILY the product of perfidy and public corruption. We just don't yet know precisely the contours of the evil deeds used to convict Petitioner and send him to prison.

IV. PROSECUTORIAL MISCONDUCT - OBSTRUCTION OF JUSTICE.

The government makes it appear that the Petitioner is simply whining about having lost, about decisions that he made with his lawyer, about a sentencing in which his choice of judge simply wasn't practical.

Nothing could be further from the truth.

14

--------------------------------------------------------------------------------

It is an ancient maxim of the law that "the plaintiff is master of his own complaint." US v. JONES, 125 F.3d 1418, 1428 (11th Cir. 1997) How then did the government leave the defendants to rot in jail for approximately a year and a half, and then SUDDENLY get a conscience less than 2 weeks before a sentencing that had been scheduled for almost 2 months? How did it come to be necessary to switch out judges on NINE defendants, when only EIGHT of the defendants (at most) were in jail? Should we believe that a defendant on bond wants a SLIGHTLY FASTER ticket to prison more than he wants JUDICIAL CONTINUITY and DUE PROCESS OF LAW????

How did the government, plaintiff in this case, manage to accomplish the switch? Who talked to who about the change? It is plain from the docket that someone with the initials "ajr" made the entry changing out the judge. There isn't even a docket number for the Petitioner to reference. Petitioner can only reference this as "the docket note made 9-13-16." The record says nothing about WHO TALKED TO "ajr," in order to persuade him or her to perform this essentially judicial act.

At the hearing, Petitioner wishes to secure the testimony of "ajr." Who came to him or her, and what was said? Actually, these facts should be determined beforehand by deposition testimony or other suitable method of obtaining evidence. That's not to suggest that the hearing is unnecessary. That's to say that Petitioner ought to get the official version of the facts in time to prepare for a proper examination at the hearing.

Petitioner duly respects both the person and office of federal judicial officers, of whatever title and at whatever level. However, Petitioner most respectfully submits that Judge Blackburn should submit a statement, so that live testimony is not required unless absolutely necessary and supported by adequate legal authority. That statement, at the very least, should 1) summarize her discussions with others about a possible change of judges, identifying each person, the approximate date or time frame, and the substance of the discussion, 2) set forth the reasons she didn't enter an order of recusal or other order in conformity with 28 USC 137, and 3) state the specific nature of the "conflict" if any, 4) state why the change was made for Petitioner as well as the other eight defendants, and 5) the reasons, if any, that a short postponement would not have sufficed to preserve continuity of judicial officers.

All this is without prejudice to concerns with respect to who will preside at a hearing on the 2255. Petitioner sees the initials on the case at the present time. Nothing herein should be construed as an objection should the matter be assigned to Judge Blackburn, in conformity with applicable law and rule. In such case she could state the aforementioned facts from the bench or in a suitable order.

This motion really isn't about the judges or any of them who have presided in this case, at one point in time or another. Petitioner assumes the good faith of the judges of this court. Petitioner is ENTITLED TO RELY on the good faith of all public officials, absent proof of good reason to do otherwise. MARINE SHALE PROCESSORS V. US EPA, 81 F. 3d 1371 (5th Cir. 1996); STARR V. FAA, 589 F. 2d 307, 315 (7th Cir. 1979). Petitioner has no legal duty to be constantly suspicious of federal employees and officers.

Petitioner's primary objection is to the use of "bait and switch" tactics by the government. The facts make out a strong case that Ms. Redmond deliberately refrained from presenting her perjured testimony about the "setup" on the coffee table, because neither Judge Blackburn nor the jury would believe it. The testimony was contradictory to what Sgt. Jacks told the jury, and raised far more questions than it answered.

However, Ms. Redmond could use that testimony at sentencing - provided she didn't have a judge who would remember what Sgt. Jacks testified to at trial. This perjurious testimony could be used to good effect - so long as there was no CONTINUITY, and thus no INSTITUTIONAL MEMORY of the development of the case.

Why would Ms. Redmond do this? Consider the following:

1) PSR page 12, paragraph 39, 20.45 grams of cocaine base never admitted, thus not usable per Judge Blackburn's ruling at TR I, pg. 5. This gave her an 8 point boost that Judge Blackburn would shoot down based on her rulings at trial.

2) PSR page 12, paragraph 40, two pistols, dangerous weapons, netting 2 more points based on knowing and willful perjurious testimony.

3) PSR page 12, paragraph 41, running a drug premises, based on controlled buys at 269 JMA, involving drugs, scales, and firearms. The firearms were a fraud as previously explained. The controlled buys were TOTALLY switched out to controlled buys NOT MENTIONED OR INTRODUCED at trial, whereas Monica Talley's controlled buys aren't mentioned or relied upon AT ALL in the PSR. These 2 points are based altogether on a fraud upon the court that couldn't with any expectation of success be practiced upon Judge Blackburn, who presided and made the alleged "numerous incorrect

------------------------------------------------------------------------------------------------------------

evidentiary rulings and comments" Ms. Redmond pouted about (by and through other counsel officed at 131 Clayton Street) at page 5 of the appellate response brief.

Lest the government think to claim this was an oversight, consider the fact that the government confessed that its evidence was no good, and OMITTED the count related to the alleged controlled buy 6-4-12, from the superseding indictment. She tried the case without this count, then surreptitiously pulled it back in for sentencing. We see it in the PSR at page 6, in the chart of controlled buys allegedly from Marquis Tymes and Petitioner.

Dismissing the count up front, then using the charge in a sneaky backdoor "late hit" in the PSR, DOES NOT excuse the government from its BRADY/GIGLIO obligations. Petitioner asked the government to turn over the videotape of the alleged controlled buy 6-4-12. They feigned honor by removing the count from the superseding indictment, knowing the charge was totally frivolous and wholly without merit. In fact the government was using the dismissal as a ploy to evade its BRADY/GIGLIO obligations, with intent to punish Petitioner AS IF he was found guilty of the count by the petit jury, so long as they had as much as a single count of conviction upon which to base the punishment.

"The district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing." UNITED STATES V. POLAR, 369 F.3d 1248, 1255 (11th Cir. 2004). A sentencing court my consider any information with sufficient reliability. UNITED STATES V. RILEY, 142 F.3d 1254, 1258 (11th Cir. 1998). Consider this paragraph from US V. CERPAS, 397 Appx. 524 (11th Cir. 2010)(per curiam) in which the court discusses the "preponderance of the evidence" standard at federal sentencing hearings:

   In addition, the district court can consider "reliable hearsay..., so long as the defendant has the opportunity
   to rebut the evidence or generally to cast doubt upon its reliability." UNITED STATES V. QUERY, 928 F. 2d
   383, 385 (11th Cir. 1991) (quotation omitted) We afford "substantial deference" to the district court "in
   reaching credibility determinations with respect to witness testimony." UNITED STATES V. PHAM, 463 F.3d
   1239, 1243-44 (11th Cir. 2006) (quotations omitted). Witness testimony is incredible as a matter of
   law if it is "unbelievable on its face." UNITED STATES V. RIVERA, 775 F.2d 1559, 1561 (11th Cir. 1985)
   (quotations omitted). Testimony is unbelievable on its face when the witness testifies to facts that he
   "physically could not have observed or events that could not have occurred under the laws of nature."
   Id. (quotations omitted).

Even considering the exceedingly lenient standards for sentencing, Ms. Redmond's conduct with respect to the withdrawn count of the original complaint, regarding the controlled buy 6-4-12, constitutes a breach of her ethical duties. If Ms. Redmond doesn't believe the count enough to leave it in the indictment, it is not a meritorious claim or contention such that an attorney might ethically argue it in court.

---

Based upon Judge Blackburn's ACTUAL RULINGS at trial, the government couldn't possibly get over 16 points, even if they disregarded the standard USSG guideline for felon in possession and substituted the guideline involving drugs, elaborately explained by the Probation Officer. That's a lot of work for a 2 point boost, taking Petitioner from the 16-21 month range to the 21-27 month range. Petitioner has already served over 27 months flat.

Furthermore, the government has boxed itself into a "heads I win tails you lose" box of its own making, with its perjurious "photo-op" setup on the coffee table. An indictment secured by perjury cannot stand. Assuming arguendo that the government didn't use this testimony, an indictment "phonied up" with no evidence at all, on a count of the complaint, can't stand either.

If the testimony at the grand jury was somehow THE TRUTH, it necessarily contradicted the "photo-op" setup on the coffee table. Petitioner was thus entitled to the TRUTHFUL testimony, since staged eficence constittues BRADY/GIGLIO material of the first order.

   V.  PETITIONER'S APPELLATE COUNSEL FAILED THE TEST REGARDLESS OF THE CONTOURS OF THE TEST

Petitioner is not given to complaints, as a general rule. Petitioner is supremely grateful for the yeoman's service provided by Russell Duraski. To the extent that anything herein calls his performance into question, it is without prejudice to the fact that he is an expert and conscientious attorney, who takes his oath of office and duties of attorney at law seriously. Nothing herein should be construed to cast aspersions upon him personally, whatsoever.

However, the point of a claim falling under "ineffective assistance of counsel" does not for its effectiveness depend upon casting blame or aspersions. It goes without saying that the grant of a petition under 28 USC 2255, habeas corpus, does not necessarily imply that the lawyer was a bad person or a bad lawyer or deserving of any punishment whatsoever. All human beings are fallible.

Even if the lawyer did a really, really bad job, the goal should not be to excoriate or humiliate the lawyer. The government cites case law saying that the point of the "ineffective assistance of counsel" category of claims, is to ensure that our adversarial system WORKS. It is not to guarantee that every defendant shall receive THE BEST legal representation.

Without prejudice to any claims herein, Petitioner's focus is on the performance of Paul Cooper, appellate counsel in this case. Without fail, sitting judges on this case, at appropriate times, have acknowledged that Russell Duraski expertly preserved his objections, principally but far from exclusively the NELSON claims. Judge Blackburn commented that Mr. Duraski made one of the best closing arguments that she had heard in 25 years on the bench. TR III, pg. 139. Mr. Duraski was SUCCESSFUL, on all counts save one. Mr. Duraski performed yeoman's service at sentencing as well, considering the deceit and shady dealings practiced upon him by the government.

The government provides an affidavit from Mr. Cooper, saying that he met with Petitioner, and they decided to object to the switchup on the judges. In fact this meeting occurred, and in fact Petitioner agreed to raise this issue.

What Mr. Cooper doesn't say is that he neglected and failed to confer with Petitioner AT ALL during the drafting of the appellate brief. Lawyers get a license to take the lives, liberty, and property of other people in their hands. They are highly trained, and they receive substantial fees for their work. Society, through such forms as state supreme courts, bar associations, etc., imposes certain duties on attorneys. Much of these requirements are contained in rules of professional conduct. There are model rules generally promulgated nationally, with local variations. These rules form a "floor" of performance below which no lawyer is permitted to descend.

Petitioner lives in a prison designed for 1,500, holding 2,000 inmates. We don't have those ethical rules, in hard copy or otherwise. The Department of Justice provides an electronic legal research tool called "Lexis-Nexis Premium," so wretchedly substandard that it couldn't be GIVEN AWAY "on the street." Ethical rules and decisions are conspicuous by their absence. Why? Why does the prosecuting authority hold the custody of its adversaries in the first place? If this is to be done, why is the prosecuting authority allowed to be the SOLE SOURCE for electronic legal research, AND to deprive the inmates of whole categories of legal research, taken for granted on the street?

One of those requirements is that the lawyer keep the client reasonably informed. Another is that the attorney has to follow the

17

-------------------------------------------------------------------------------------------------------

lawful directives of a criminal client. Beg pardon that Petitioner can't cite specifically and show the caselaw. The Attorney General possesses NOT ONLY the Petitioner's offer to donate a PROPER AND PROFESSIONAL copy of Lexis-Nexis, (the real thing, not the crap foisted on inmates by the DOJ-FBOP) computers, software, service and supplies, office supplies, etc. The DOJ-FBOP has several offers of this nature, verbatim or nearly so - yet it responds substantively to NONE OF THEM.

The DOJ-FBOP relegates Petitioner to a wretchedly substandard legal research program, which excludes not only ethics rules and decisions but also all state statutes and decisions, prior versions of the federal Code of Federal Regulations, and myriad other resources readily available to, and used by, competent attorneys or even private citizens in the free world. "Cut and paste" are disabled, many cases are hidden or require a "work-around" to find," prints are grossly overpriced, there is no way to make notes, the libraries are chopped into irregular and often mislabeled directories, "recent" cases are all jumbled into directories, etc. This is just a small sampling of the suppression of legal research and work by inmates, and the DOJ-FBOP is never finished obstructing inmates from their legal work. If they think of a new way to make legal research harder, more expensive, or less effective, they implement that "improvement" immediately.

That being said, Petitioner sent Mr. Cooper a letter asking for a conference. Petitioner sought opportunity to get a draft of the appeal brief, review it, mark it up, and otherwise collaborate with Mr. Cooper to preserve his appellate rights to the best of his abilities.

Mr. Cooper ignored Petitioner's attempts to communicate. Please note that Mr. Cooper is a "CJA lawyer" appointed under the Criminal Justice Act, 18 USC 3006A. He is not an overburdened and overworked public defender. There is no good reason for Mr. Cooper to neglect and fail to communicate with Petitioner. He gets paid by the hour, and its Petitioner's liberty is at stake.

Mr. Cooper filed the brief FIRST, and THEN sent the brief to Petitioner. That action was in derogation of the MINIMUM STANDARDS of lawyers in Alabama. How is Petitioner supposed to help get the brief right when the brief has already been filed?

Nor did the brief conform to the basic requirements of an appellate brief. Consider the following that can be gleaned from this document:

   1) Mr. Cooper had ONLY ONE ISSUE but could not be troubled to say what that issue was, in the table of contents.

   2) The table of contents is not paginated, which proves that Mr. Cooper doesn't know how to set up two different forms of pagination within a word processor document. The table of contents uses lowercase roman numerals for the technical parts of the brief, which proves he understands the basic concept.

   3) The page references in the table of contents as well as the table of authorities are mostly if not totally erroneous. This proves that Mr. Cooper does not know how to set up automatic tables of authorities and contents. If he created automated tables of contents and authorities using suitable word processor software, he could "regenerate" all the tables in about two seconds. It would be very easy to make sure that all tables of contents and authorities were accurate and professionally formatted.

   4)   The standards of review, a basic and essential part of a proper brief, demonstrates a complete lack of understanding about how to set forth the claimed standards of review, with citation to authority. The government did his job for him, in its response brief.

   5)  Nothing in the brief explains how Petitioner was PREJUDICED by the legal error he asserts. It is highly probable that a different result would have been obtained, if Mr. Cooper has simply set forth a recitation of the fraud and deceit practiced by the government, as set forth in Petitioner's amended petition and this reply brief. An appellant needs to show how the result would have been different, but for the error(s) raised on appeal.

Petitioner has no desire whatsoever to embarrass Mr. Cooper. Indeed, Petitioner would be most delighted to help Mr. Cooper learn how to do these things and do them well. Petitioner is not alleging malice or intent. Mr. Cooper simply didn't know the basics necessary for the preparation of an effective appellate brief. It is not to soon to learn.

------------------------------------------------------------------------------------------------

:

The government in its first brief, page 10 of Docket #5, quotes case law, saying that "the Petitioner must establish that NO COMPETENT COUNSEL WOULD HAVE TAKE (sic) THE ACTION THAT HIS COUNSEL DID TAKE..." (Emphasis was italics in original, which is impossible on Trulincs.)

No lawyer is allowed to fail to keep his client informed.  The Model Rules of Professional Conduct impose this duty on lawyers. On information and belief, all 50 states include this requirement.  Therefore, failure to keep a client informed is a floor below which no lawyer may descend, an action (or inaction) that no competent counsel would take.  Furthermore, we can see that the failure to consult with Petitioner not only resulted in the submission of a brief with embarrassing errors and tacit admissions, it resulted in a brief that quite simply failed to fairly show the appellate court how the SOLE claimed legal error resulted in prejudice and injury to the Petitioner.  If the government wishes to argue that SOME COMPETENT COUNSEL might possibly do such things, they should seek permission to file a sur-reply.

   VI.  THE GOVERNMENT PRETENDS THAT CLAIM FIVE DOES NOT EXIST.

The government at once claims that Petitioner's amended petition is untimely - and pretends that claim five does not exist.  The government includes part V of its response to amended petition, at page 10, entitled "miscellaneous."  The first paragraph argues that Petitioner has not pled sufficient facts or evidence to warrant an evidentiary hearing.  The second and final paragraph contains but a single sentence, set forth below.

   Any facts not specifically admitted in this response are denied, and the arguments made are in the alternative.

A petition under 28 USC 2255 is deemed a civil proceeding.  Federal Rule of Civil Procedure (FRCivP) 11 prohibits lawyers from making frivolous claims, contentions, or DENIALS.  FRCivP 11(a) requires pleadings to be signed, and under 11(b), that signature amounts to certain representations, as follows:

   (b) REPRESENTATIONS TO THE COURT.  By presenting to the court a pleading, written motion,
   or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or
   unrepresented party certifies that to the best of the person's knowledge, information and belief,
   formed after an inquiry reasonable under the circumstances:

       (4) the denials of factual contentions are warranted on the evidence or, IF SPECIFICALLY
       SO IDENTIFIED, are reasonably based on belief or a lack of information.
       (Emphasis added)

Is the government denying that Petitioner offered the computers, software, tech support, office supplies, etc., that his Exhibit "1" purports to offer?  Such a representation is totally frivolous and wholly without merit.  Such a representation violates FRCivP 11. The government's "general denial" in reality encompasses a great number of violations of FRCivP 11.

The government has sought and received FRCivP sanctions against petitioners proceeding under 28 USC 2255.  See for example US v. QUIN, 836 F. 2d 654 (1st Cir. 1988).  Sauce for the goose is sauce for the gander, they should not be surprised about a motion for sanctions for their own misconduct.  Furthermore, within FRCivP itself is a "safety valve" that essentially gives litigants violating parties a chance to re-think their position.  Motions for sanctions are SERVED but not FILED, for a period of not less than 21 days.

Petitioner is taking this course of action.  A motion for sanctions is being SERVED but not FILED, contemporaneously with this pleading.  Furthermore, the government should feel free to take advantage of the following generous offer.  If the government will IN WRITING give permission to Petitioner to make the requested donations at YAZOO CITY LOW, WITHIN 90 DAYS of the date at the bottom of this pleading, Petitioner will give the government a "FRCivP 11 pass" for all the other lies encompassed in their general denial.  Of course Petitioner reserves the right to argue the merit of his own legal and factual allegations. Petitioner by this "pass" simply agrees not to make a FRCivP 11 issue over any other MERITLESS DENIALS, if the government will be so kind as to correct this one denial, in the manner proposed herein.  Petitioner will in such case satisfy himself with arguing the validity of his factual and legal contentions to this Honorable Court, in pursuit of appropriate relief under 28 USC 2255.  If the government chooses not to take this course, Petitioner expects an HONEST AND SPECIFIC response to the remaining allegations of his petition.  19

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
_____DIVISION**

## CERTIFICATE OF SERVICE

I, _Aaron Keith Reynolds_ , do hereby Certify that a true and correct copy of the foregoing has been furnished by _CM/ECF & US Mail_ (manner of service, i.e., U.S. Mail, electronic mail, etc.) on this _20_ day of _May_ 20_19_, to:

_Kevin P. Davidson & Brandon Bates_
_US Attorneys Office_
_131 Clayton Street_
_Montgomery AL 36104_

_5-20-19_

Date

Signature

⇔09093-002⇔
Aaron Key Reynolds
09093 002 Federal Correction Complex
Po.Box.5000
Yazoo CITY, MS 39104
United States

   

FEDERAL CORRECTIONAL COMPLEX
P.O. BOX 5666
YAZOO CITY, MS 39194

THE ENCLOSED LETTER WAS PROCESSED
ON ___5-22-19___ THROUGH SPECIAL
MAILING PROCEDURES.

The letter has neither been opened or inspected. If
the writer raises a question or problem over which
this facility has jurisdiction, you may wish to
return the material. For further information or
clarification. If the writer encloses
correspondence for forwarding to another
addressee, please return the enclosure to the above
address.

⇔09093-002⇔
Clerk Federal Court House
1 Church ST
Montgomery, AL 36104
United States

Legal Mail